and Ramirez. This is one where we have to make sure our technology is set. So let's take a minute to ensure that. Mr. Breslin, are you on the line? I am, Your Honor. And Ms. Beard, can we get that on our screen? He's not on the screen. Oh, he's not on the screen at all. Oh, I thought that the screen and the voice might be out of sync. I think that what he did is he has both on. Mr. Breslin, let me just hear you. I want to do an audio check. Yes, Your Honor. I'm on here. Yeah, we're getting a lot of reverb on you. Let's just do phone. I think if we're not getting video, but your video is creating the reverb with the audio, we probably ought to just go audio. How is this, Your Honor? That's better. Talk a little more. Thank you for accommodating my health issues, Your Honor. I do really appreciate it. I'm sorry for this. No, that's okay. It's not a problem at all. We've gotten good at it. So I'm disappointed we can't see you. But we'll listen intently, and we won't be distracted by what you're wearing or what's going on behind you. All right, so Mr. Breslin, let me just set the ground rules here. So the way we've set this up is 12 minutes for each side, and you and counsel for Mr. Ramirez have split this six and six, but you've each reserved a minute for rebuttal. Is that right? That's correct. Okay. All right, so Mr. Breslin, that gives you five minutes now out of the gate. I don't know if you have a clock that you can see, but hopefully you have a timer nearby. I'll let you know when the time's up, okay? Thank you, Judge. If it pleases the Court, Your Honor, we raised in our briefing three issues regarding Mr. Collins and Mr. Collins' conviction. The first is the supposedly voluntary consent of his home resulting in the weapons that were seized there, which have constituted count three of the indictment. And then there is a brutal issue regarding a statement made by Mr. Ramirez, which was redacted, recontended properly, but read to the jury. And then there is an insufficient evidence at trial point. I will concentrate the time I have on points one and two. The totality of the circumstances, which is, I think, the legal metric by which the warrantless search of Mr. Collins' home has to be evaluated, shows that he did not give voluntary consent for the search of his home. And I think... I mean, he asked to go back into his apartment, right? He's home. He's home. That is what one agent said. Mr. Collins denied... The district court credited that testimony, correct? Correct. But the district court... Go ahead. I'm sorry. Well, just, I mean, on what basis would we conclude that that was error? Well, the district court, in our view, did not focus on what we think the most salient point of this so-called consent was, which is that the government agent had a motive to kind of concoct a scenario by which he needed to get into the house. Agent Menton, at the suppression hearing, testified that he was aware that there were likely guns in the Collins' home. He had received that information at some point from a cooperating witness, but he also conceded that that evidence was stale and that he did not think he was going to be able to get a search warrant based upon quality of that evidence. So the only way that the government could gain access to Mr. Collins' home was to make an argument that he somehow consented. And if you look at the circumstances by which Mr. Collins was stopped, it just simply doesn't make sense. But, again, this was argued to and certainly could have been amplified in front of the district court, right? It was argued to the district court, Your Honor. That is correct. But the district court, in our view, did not adequately weigh and consider the totality of all the circumstances. I mean, Your Honors, this was a gentleman who left his house at 6 o'clock in the morning, was dressed for work, was arrested on the street while he was throwing his garbage away, surrounded by a phalanx of government agents with long guns, forced to lie down face down on the street with guns drawn, first handgun— No, I think we get all that. I think the issue is, do those facts compel a conclusion that people confronted with those sorts of things don't ask for coats? Well, the issue of the coat, we feel, was really a pretext. This arrest took place in June. The record showed that Mr. Collins was wearing multiple layers of clothing as he was getting ready to go to work. This is something that was put before the court. It was 60 degrees that morning. Now, the government made a big issue that this was somehow unseasonably cold for June, and that Agent Metton took the position that Mr. Collins was shivering, and Mr. Collins struck him as the kind of person that when he got cold was going to stay cold all day. I mean, Your Honors, with all due respect, those are after-the-fact justifications in order for them to make the argument that he had asked for a coat. He was dressed for work. There was just no rational way that he would have asked, that he would have invited dozens of armed law enforcement officers into his home, where he knew there were guns, because he was a little bit chilly in the middle of June. It doesn't make sense. All right, Mr. Breslin, your red light is on, but you probably can't see it. So why don't we get to the Bruton issue very briefly. Very briefly, Your Honor, and thank you. You're right, I am having a little trouble with not only my voice, but with the time. Mr. Breslin, I'll just ask out of the gate if you think we should hold decision on this pending the Supreme Court's resolution of the Samia case, which they just took on arguably comparable Bruton issues. Quite possibly, Your Honor. That was fairly recent and obviously posted in any of our briefings. Right. But I know in a very general sense what that case is about. There is a fair amount of overlap. I mean, it's from the circuit, although it was a summary order, but it applies our circuit law on the redaction issue. The redaction issue is a tricky one, Your Honor. I mean, you know, in our view, the redactions that were applied here by the district court simply didn't make it not obvious, which is a double-edged sword, but it didn't make it not obvious that the person Mr. Ramirez was talking about was in fact Mr. Collins. Why is that? There were multiple co-conspirators, right? There were not multiple co-conspirators. Well, I mean, there were multiple co-conspirators in the sense of Mr. Moab and Mr. Johnson. Correct. But those names, you know, the way the questioning was done and the way the statement was structured, in our view, makes it clear that the person, whether he was known as the guy or him, could not have been anybody other than Mr. Collins. And as a result, we feel that the statement was profoundly prejudicial in what we contend, from a purely evidentiary point of view, was a closed case. All right. Well, you're over, but you reserved a minute for rebuttal, so why don't we hear now from your colleague, Ms. Van Ness, for Mr. Ramirez. Good morning. I, too, have raised three issues in the brief, and I'm going to concentrate on point one. The hallmarks of a criminal investigation of any kind are motive and opportunity, and on both these points, I think the evidence strongly demonstrates that there was a plot to assault Mr. Santiago, but that it's inconsistent with a plot to kill Mr. Santiago. There are eyewitnesses who said the exact opposite, and so you're saying that the evidence in this case was so overwhelmingly of a nature that the jury would have been compelled to disregard the testimony of Moab? Well, I think if the jury's attention had been focused on all of the arguments that are presented on appeal, which they weren't, that they would have reached a different result. And so I understand the deficiency argument poses a very heavy burden on the appellant, but given the fact that the jury did not hear all of the arguments that are made in the brief, I would ask the court to consider these arguments. On the evidence, did the jury not hear that they should have? I'm not saying that any evidence was excluded. I'm saying that the points that you could draw from the evidence weren't marshaled for the jury. So the summation failed to make the argument that you're making now? Yes. Did it get back to the assistance claim? Well, if it comes to that on 2255, I guess. I understand there's, you know, this court's case law and the Supreme Court has disfavored presenting IAC. No, no, no, I get that. I'm just saying that that's essentially what you're saying, all right? Well, I'm saying in the context of a sufficiency argument that it would be inappropriate for the court to say that the jury heard all of this and who are we to intervene? No, but the jury should have had basically no choice but to reject the testimony in MOAC concerning this conspiracy morphing from a beat-up to a murder. So why? What is it that makes MOAC so unreliable that it should have been basically a direct deferral? Again, there's only one pointed issue here, and that's the intent of the defendant. I'm not saying that MOAC was incredible as a matter of law throughout its entire testimony. But on the motive, he said that he was offered $25,000 in cash, $3,000 additional money in forgiveness of a drug debt, a job in my client's company, a very expensive amulet that was given to him to ward off evil spirits, and the payment of his censorea initiation right to commit a murder. And yet it took more than 13 months for MOAC to even go to Santiago's house with the idea of doing him any harm. And this was eight months after the alleged confusion about Santiago's home address was clarified. That was done in February of 2018. And MOAC never went to act on this very lucrative deal. But how does that affect the question of whether this lucrative deal was for assault or murder? Are you saying that the benefits that allegedly were offered also are just invented? I'm having trouble understanding why his failure to sort of get moving on this in light of the lucrative offer affects this question of whether the lucrative offer was for assault versus for murder. Well, my client said in his post-arrest statement that he gave Mr. Collins $2,000, which, although I've never hired anybody to commit assault, seems like a, you know, possibly reasonable amount. But this was over $30,000 that MOAC claimed he was offered. And that is incredible given how lackadaisical Mr. MOAC was in acting on this commission. He also was given the commission by his gang leader, his big homie, who said that the order to kill would benefit not only MOAC with all this financial remuneration, but would benefit Mr. Collins, the gang leader, and the gang, because they would get some good contracts from my client's company. And so he had the specter of his gang leader saying, do this, do this, not just for yourself but for me, and he didn't pay the slightest attention. He was busy committing armed robberies up and down the East Coast. He committed a murder, cold-blooded murder of another man over just the fact that the other man disrespected him, and he was shot to death, and yet he had this, and there was no financial incentive for him to kill that man, Mr. DeGrace, but yet he was given this great incentive to kill Mr. Santiago, and he just never paid any attention to it. So I think the motive and the opportunity, with all of this time passing, shows that his testimony about the amount he was offered was incredible. But these were all arguments made or that could have been made to the jury, right? Yes, and I'm asking you to consider the fact that they weren't made to the jury. The jury was never given a timeline of the 13 months or the 8 months. They were never admonished to consider the specter of the gang leader ordering a killing. I think the argument I'm making is a sufficiency argument and it's based on the evidence that the jury heard. And if the jury had been focused and paid attention, they would recognize that the evidence was insufficient to support a claim by Moat that he was offered this huge amount of money to commit a murder. In essence, you're asking us to presume that the jury wasn't capable of following the evidence, that they were only capable of following arguments made in summation. If the arguments weren't made, then we should basically overturn the conviction. I think the principal argument that was made was that Moat was completely unworthy of belief in any fashion. And that's an argument that the jury could not make because there was plenty of evidence that the parties talked to each other and so forth. So the jury could believe Moat? They could believe Moat with respect to the plot to assault. There was all sorts of details that they could credit.  The plan changed. It originally was an assault? Which Moat expressly testified to. Yes. So there's evidence from which the jury... There's evidence from a witness that I would say on this point is incredible and could not be credited. And the jury wrongfully rejected or accepted that testimony. And also, another argument that was not made below was, if Moat was incredible, how is it that Mr. Johnson corroborated evidence about the murder plot? Well, there was evidence in the record that nobody ever talked to the jury about, that the two had a chance after Moat was arrested to... They talked on the phone and there was evidence that they could visit in jail. There was evidence that they were in jail together when Johnson was finally arrested several months later. And so there was an opportunity for them to collude on this one point. What were they hired to do? That's the only point that I'm contesting. And I think the jury was wrong to accept Moat's testimony on that point. Do you have any further questions? No. All right. Thank you very much. We will now hear from the government. Mr. Hobson. May it please the Court, Your Honor. My name is Adam Hobson. I'm an assistant United States Attorney in the Southern District of New York. I represent the United States on appeal, as I did at the trial and sentencing below. As the Court's questioning has recognized, almost all of the appellant's challenges are challenges to factual and credibility determinations that were made below,  Yeah, not the Bruton issue. Maybe we should start there. The question is, should we wait? And I guess the answer to that question turns in part on whether or not we think the redactions done here would pass muster under the more rigorous standards that other circuits have adopted that require courts to look not at the statements in isolation, but in light of other evidence at trial. Yeah, we think that the statements here would likely still pass muster. Certainly, the redactions here were consistent with this Court's precedence in jazz. Would likely still pass muster. Well, we don't know what the Supreme Court will say. That's an argument to wait, I guess. We don't object to waiting to resolve the question of the sufficiency of the redactions. However, we do think we're going to be waiting. I don't know, Your Honor. I think Sir was just frantic. That's beyond the record. Well, it's not going to be, you know, we have, I guess, another case today that involves, as Sir granted, an argument held. This is one we don't have a briefing yet, right? That's correct, Your Honor. Could be a year. One thing I want to emphasize is I think that we have a very strong harmlessness argument here that I want to touch on for a minute, and I think that is one way that the Court could reach the issue now rather than waiting for the opinion. Because even if the redactions here weren't sufficient under a future standard, any error here was harmless given all the evidence against Collins. One thing that I think, that I don't want to get lost is that Ramirez's post-arrest statement was a bit of a mixed bag for the government's case in chief. While it did connect Ramirez to the plot overall, it allowed Ramirez to make the affirmative defense of this was just an assault, it was not a murder, because he said that repeatedly in his post-arrest. And, of course, that was one of the defenses that Collins made repeatedly, so it actually gave Collins an opportunity to have record evidence to point to for one of his primary defenses, which was this is not an assault, it was a murder. In addition, with respect to Collins in particular, and I think the Court has recognized this with some of the questions, there was just a mountain of evidence against him. You had Mowat's testimony, that Collins had offered him $25,000 to do this murder. But you didn't just have one cooperator testifying, you had Johnson, the second hitman, testifying to the same thing. Johnson overheard phone calls between Mowat and Collins, where Collins was pressing Mowat to hurry up and do the murder. Johnson heard him yelling at him. We had mountains of phone records that confirmed all these communications. We had phone records and cell sites that showed Mowat in the field with Johnson conducting surveillance, calling back to Collins, and then Collins switching phones to call Ramirez, then switching back to his other phone to call Mowat, obviously reporting on what was happening. You had pictures of the victim on Mowat's phone. You had surveillance videos of their surveillance missions on Mowat's phone. You had the victim's testimony about Mowat and Johnson actually showing up at his house. You had text messages from Collins to Ramirez telling Ramirez to stop using the phone. You had the gun found in Collins' house that matched the gun that Mowat had bought for the murder. All of this evidence was before the jury, all but more than supported the jury's verdict, and we submit that even if the redactions were not sufficient, that error was harmless here. The one other thing I'll note in response to the arguments that have been made, and of course I'll take any other questions the Court has, but on Mr. Ramirez's point that these arguments about Mowat not taking the job seriously, not taking too long, that was really the heart of a lot of the arguments made before the jury blow. So I'm not sure what Appellant Counsel's means that those arguments weren't made to the jury. Those arguments were made to the jury, and they were rejected. Regardless, as Judge Nathan points out, all this evidence was before the jury. The jury was able to consider it, whether the arguments were made or not, and they found that the evidence, beyond reasonable doubt, convicted both men of this murder plot. If there are no further questions, I'll end there. Thank you. Let's hear from Mr. Breslin for a minute of rebuttal. Thank you, Your Honor. You know, it's a bit of a conundrum because it's kind of difficult to divine what the Supreme Court will do and when. However, you know, not to be insensitive, but both of these individuals received fairly robust prison sentences. Well, I guess that's true, Mr. Breslin. I guess that's true, but I mean, we have a number of other circuits that have weighed in on this, and so there's some ability, I guess, at least to assess what are the range of possible rules that might be adopted by the Supreme Court. Do you think the result would have been different under one of the rules employed with respect to statements and bruton in other circuits? Well, to quote my friend Mr. Hobson, likely yes. Certainly there's a significant chance that it could end up with a different rule that would have resulted in a very, very different outcome. Okay, but under what circuit's rule would the outcome have been different and explain to me why? I can't at the present time. I would only say that the redactions done below by Judge Castell were just simply resulted in an affirmative injustice and did not meet the standards required by Gray or even this circuit's rule in terms of mitigating the prejudice toward Mr. Collins. All right. What about the harmless error argument that Mr. Hobson just made? That would be part of the inquiry, typically a brutal violation. It's not an automatic reversal. That's right. That's right, and I think with all respect to the government, they are overselling the harmlessness aspect. If I may, Mr. Breslin, to focus the question, since what's in dispute is the question of assault versus murder, and Mr. Ramirez's statements take the position that it was assault, not murder. What is the harm? Well, the harm was that there was not a mountain of evidence and there was context provided the relationship between these men. Collins never met Johnson. Moak was a profoundly flawed and terrible witness, and as it turned out, that statement that was admitted, albeit scrubbed to some degree under Bruton, was actually a significant piece of evidence against Mr. Collins, which should not have been admitted into evidence at all. All right. Okay, I think we're over a minute. Actually, two and a half, but thank you. We'll now hear from Ms. Van Ness for a minute or so. Thank you, Your Honor. I think the argument that was just made sort of makes my point, which is that the summations were driven by a claim that Moak was an inveterate liar who had a motive to lie and should not be believed at all, whereas on appeal I have conceded Mr. Ramirez's guilt of assault and am arguing only on one point, what was his intent. And so the arguments that I'm making were not made to the jury below. A couple of things that Mr. Hoskins said. There's a standard jury instruction on credibility that says you can accept some of the witness's testimony but reject other of it. That is, you don't have to – credibility is not 100 or nothing. Was that instruction given? I'm sure it was. I understand that jurors are presumed to follow instructions, and this court is very much hamstrung in its review capabilities for a sufficiency argument. But it has reversed based on insufficient evidence on occasion, and I'm asking it to do so in this case. The arguments that Moak was not taking the job seriously or taking too long were made below in some fashion glancingly, but they were in aid of the argument that there was no plot to do anything wrong, that the defendant should be acquitted completely. And also Johnson did not corroborate anything about the alleged price that was offered. That was solely from Moak. In fact, Johnson didn't even say what he was offered to kill someone. He said that Moak told him that anything his little heart desired he could have if he would just help kill this man. So there was no corroboration for these critical points that differentiate an assault plot for $2,000 from a murder plot for over $30,000. Thank you. Thanks very much. We will reserve decision. We'll now move to the next case on today's calendar. That is Bennett v. Commissioner of Social Security. Mr. Radel, am I pronouncing that right? Radel, yes. Radel. Okay, sorry about that. No, thank you. Mr. Radel, you've got ten minutes total, but two minutes you've reserved for rebuttal. So you may proceed, but maybe we ought to start with the issue that was presented yesterday in the government's letter. So your client had subsequent applications to Social Security for disability benefits, which were granted. She's only, as I understand it, getting benefit payments going forward after 2019, but there was a finding of disability that had its onset during the period of the disputed application here. Correct, yes. Okay, and so is this something that's news to you? It was news to me, yes. I did speak with counsel who handled the file on behalf of the claimant at the administrative level and the district court. He did advise me of that. He, I don't think, noticed the fact that the state agency had included within its determination that my client was entitled to benefits that the alleged or the determination of onset of disability was back to November of 2015. Okay, so this is the first time you're learning. And so why does this matter, and what do you want to do about it? Right. I think that in terms of the issues before the court, it does not matter. It does not? No, because the appeals counsel's order that is under review here dealt with the question of whether my client was entitled to benefits for the period between November 23rd of 2015 and October 24th of 2018, which was the date of the ALJ's decision. Although my client was awarded benefits pursuant to the subsequent application, that only has been paying her back. No, I don't think anybody's suggesting that this is moot, but does it matter? In other words, there was a suggestion in the government's letter that you might want to make a supplemental briefing based on these later developments. Is that true? I have not, finding out about it yesterday, I have not had the opportunity to research the issue fully. It is my understanding, though, that because that's a determination made by the state agency, it's not necessarily binding on the commissioner of Social Security in terms of. So my client was awarded benefits at the agency level, state agency level, and that determination, that agency's determination as to the onset of disability is not necessarily binding on the government. I gather the agency's determination here wasn't binding on the state since it seems in conflict, right? Correct. So you don't want to supplement your briefing? I would like the opportunity, Your Honor, to reserve that right to supplement my briefing based on further research. But in terms of moving forward today, I think there's a likelihood the issues for today still remain live because there is this issue of unpaid period of time for benefits. Yeah, I don't think anybody's suggesting it's a moot case. Okay, so go ahead. Thank you. So after high school, Marie Bennett worked for 23 years as a secretary and patient access representative for a Syracuse hospital. She suffered a traumatic brain injury in 2011. Marie returned to work following her injury but experienced memory problems, pain, and panic attacks and was terminated in November of 2015. It is undisputed that Marie has several severe impairments within the meaning of the Social Security Act. It's also undisputed that she can no longer perform her past relevant work. In this appeal for the denial of disability benefits, we raise two main arguments. Our first argument relates to Marie's ability to rotate her head and neck during the course of workday. The record demonstrated that Marie experiences pain and stiffness along with vertigo-like dizziness when she turns her head and neck. Two medical opinions, one from a consultative examiner and another from a treating physician's assistant, indicate limitation with respect to Marie's ability to turn her head. And what's unusual here is that the ALJ acknowledged we failed to consider the evaluation of the consultative examiner, Dr. Lorenzen, yes. But the appeals council did, right? The appeals council did, but the appeals council filed, essentially, the failure to consider Dr. Lorenzen's opinion harmless because... That it actually supported the ALJ's decision, right? Because they were of the view that Dr. Lorenzen did not indicate any functional limitations beyond those assessed by the ALJ in his RFC determination. That's actually not the case. Dr. Lorenzen assessed mild limitation with respect to Ms. Bennett's ability to rotate her head. Well, I thought the finding was that Dr. Lorenzen found that Bennett could do a wide range of daily activities, had full cervical flexion and extension, and only mild limitations in turning her head sideways. Yes, but nevertheless, that is an additional limitation that was not included in the ALJ's RFC determination. And what I'm saying, there are two issues there. One is that it sort of begs the question to say, well, Dr. Lorenzen assessed mild limitation, therefore we're assessing mild limitation. Well, no one actually said that. The appeals council didn't actually say that. They appear to not recognize that Dr. Lorenzen had assessed this limitation with respect to rotating the head and neck, and that adding that limitation to the record changes the complexion of the record. So you have Ms. Bennett's testimony that she had limitation in turning her head and neck. You had the treating physician's assistant's opinion that Ms. Bennett had limitation in turning her head and neck. You had physical therapy notes documenting the difficulties when she rotated her head. Now, you add to that Dr. Lorenzen's confirmation, again, different in degree, but similar in kind, recognizing that she has limitations in the ability to rotate her head and neck. There should then be, given that evidence, as fully supplemented and developed with Dr. Lorenzen's opinion, there then needs to be a logical bridge between that evidence and an RFC determination that contains no limitation whatsoever on Ms. Bennett's ability to rotate her head and neck. Well, the appeals council relied on certain notes from Ms. Barbara's evaluation, where Ms. Bennett reported that she went to a water park or something, and also there was a treatment note that said that Ms. Bennett had a full range of motion. Right, but there were also treatment notes indicating that she had a reduced range of motion. And the water park actually judged, when you look at the therapy note when she went to the water park, she actually went to the water park and reported that it was a big mistake. She had terrible pain. She was seeking help because she had aggravated it by going to the water park. And there was only an indication that she did that one time, and the record instead is consistent with significant pain and limitation. Again, I think at least partially endorsed by the consultative examiner, who recognized that she did have some limitation in the ability to rotate her head and neck. Our second argument is with respect to the treating physician rule. This court has consistently recognized the importance of treating physician opinion, particularly when it comes to mental health limitations. Here, Dr. Allow, the treating psychiatrist, assessed limitation in Marie's mental ability and aptitude to perform work, critically with respect to her ability to sustain a schedule. And here, Your Honor, four mental health professionals all assessed some limitation in Ms. Bennett's ability to maintain a schedule. Dr. Grossel, the consultative psychological examiner, Dr. Brown, the state agency review consultant, Dr. Allow, the treating psychiatrist, and Ms. Barbara, the treating nurse practitioner. All four of those mental health professionals assessed at least some degree of limitation in Ms. Bennett's ability to sustain a schedule, which was particularly relevant because it was the panic attacks and anxiety and depression that caused her to lose her long-term employment at the hospital. And there is, again, no logical bridge, no explanation in the ALJ's decision or the appeals counsel's decision as to how you reach an RFC determination that presumes that she is able to maintain a consistent work schedule. Is it possible that the commissioner accounted for the limitation in concluding that she was limited to unskilled work with simple repetitive tasks? That's the best we could sort of hope for, that we could try to strain to say that the presumption is that that's what that's trying to account for. But it doesn't include limits on her ability to handle stress or production quotas or social interaction, which would be the types of things that you would ordinarily assume would be included to try to account for that type of limitation. And in any event, Your Honor, that should have been explicit. If the commissioner was reconciling all the mental health testimony to the effect that she had limitations with regard to her ability to maintain a schedule and was trying to account for that through that pretty limited carve-out from the RFC determination, that should have been, we need a logical bridge that explained why that was the result that was reached. But there's some evidence in the record to suggest that your client was not suffering from anxiety, depression, sleep disturbances, dizziness, vertigo, right? I mean, that's what the ALJ and the Appeals Council pointed to in deciding that this would be a situation where the treating physician was not to be given the presumption of verity and that there were other things that contradicted what the treating physician said, right? I think, Your Honor, there are certainly elements of the record where my client was able to be appropriate and cooperative during medical appointments and was able to engage in some limited activities of daily living. So unless you can prove that on every day the person was intact, then we have to defer to a treating physician? I think this Court's authority is that the mere reference to isolated incidents of ability to maintain appropriate behavior is not in and of itself sufficient to overcome the treating psychiatrist's assessment. I think particularly here what needed to be accounted for was, so in other words, we took the treating psychiatrist and compared it to the ALJ and Appeals Council's review of the record and assessment of what the record said, but that needed to be done in light of the fact that four mental health professionals looked at this record and concluded that she had some degree of limitation in her ability to maintain a schedule, and that consistency between those opinions merited, necessitated, a thoroughgoing discussion by the Appeals Council, by the ALJ, to explain how they reconciled that evidence and how they reached the conclusion that Ms. Bennett could, in fact, sustain a ready-to-work schedule. All right. Well, I see we're over, but you still have two minutes to rebuttal, so thank you, Mr. Radel. Thank you. We'll now hear from Ms. Carter on behalf of the government and the Commissioner. Good morning, Your Honor. May I please record? Ms. Carter, can we just start with your letter from yesterday? Yes, Your Honor. It wasn't clear to me exactly what you're saying. You're not agreeing to a remand here, right? No, Your Honor. The letter was intended primarily to notify Mr. Radel because it didn't appear that he was aware of the subsequent finding, and in the interest of full disclosure and out of an abundance of caution, we did it in the form of a letter letting the court know as well. So what would be the proper next step? Is it proper to reopen the briefing on this, you think? That would be for the appellant to decide, and my understanding is that district court counsel, who had this evidence in his possession for five months, chose not to do anything with it, so that would perhaps be a defense that the government would use. Do you reserve the right to oppose any request for a submission? We would not oppose – we would respond on the merits of a submission. We wouldn't argue that it was waived because it was done after argument or something like that, but we would – But why? I guess I'm trying to figure that out. So this is information that could have been included in whatever materials were put in the appellate brief or could have been the basis for seeking a remand. Yes, Your Honor. That wasn't the case. On the eve of argument, you learn something, you tell counsel, and now we should just sort of stop and start over? I don't think that you should, Your Honor. But we should nonetheless take a brief on this and then let you respond. Only if the appellant asks you to. Right, but you're saying you wouldn't oppose him filing a brief, right? We would not because – Because why? I'm trying to figure it out. So you think that we should routinely just allow people to file supplemental briefs when they learn about new facts, even though they had them well before the day of the brief? No, Your Honor, not at all, and if that's your position, we are fully supportive. No, I'm just surprised that you're not even reserving the right to oppose the supplementing of the record. It hasn't even been asked yet. Mr. Raylis may have been asking for it. It wouldn't be a supplementing of the record, Your Honor. Well, supplementing of the brief. Yes, Your Honor. The subsequent evidence is never going to be before this court. Right, so what would be the relevance for briefing purposes? Are you asking me to oppose the counsel with his mechanism? I don't understand why – what would be the point of reopening this for a briefing if this new information that you disposed yesterday is not really going to be properly before us? I don't believe there is a point, Your Honor. This filing was done out of an abundance of caution and in full candor to the court. And I appreciate that. I don't think that's true. You're a government lawyer. It's a potentially relevant fact. It came to your attention. You brought it to opposing counsel and the court's attention. Precisely. Just as you should. Precisely, Your Honor. Precisely. Thank you, Your Honor. To the merits, this court should affirm the commissioner's decision here. The commissioner's final decision is that of the appeals counsel, which adopted the ALJ's findings, conclusion, and rationale and added further explanation to support the conclusion that Ms. Bennett was neither physically nor mentally disabled. Regarding the physical RFC, the record did not require a reasonable fact finder to assess specific limitation on movement of Ms. Bennett's neck. The appeals counsel reasonably found that Dr. Lawrenson's opinion supported the RFC as the ALJ had assessed it without further limitations. Dr. Lawrenson noted and opined that Ms. Bennett had mild limitations in turning the head, and this opinion did not require the appeals counsel to add specific additional limitations to the RFC. As detailed in the commissioner's brief, numerous courts within this circuit have upheld RFCs similar to the one assessed here based on similar opinions of only mild limitations in turning the head, and those decisions contradict the notion that a reasonable fact finder would have been required to look at Dr. Lawrenson's opinion and assess greater limitations. Regarding the mental RFC, substantial evidence supports the finding that Ms. Bennett could mentally sustain full-time work involving simple instructions and routine, repetitive tasks. Well, here the issue is the treating physician rule, right, which is no longer the same problem that it is for you here. The rule has changed or disappeared in evidence. So let's then focus on that. So what was the basis for the commissioner to disregard the opinion of the treating physician, Dr. O'Hara? I will address that question. I just want to make clear I want to respond to both of Mr. Bradel's points regarding both the treating physician rule and the question of what the other opinion said. Okay, that's fine. Let's start with the treating physician rule. Certainly. As to the treating physician rule, the ALJ accurately recited Dr. Allao's opinion and noted that Dr. Allao's explanation for the opinion was that the limitations were attributed to short-term memory loss and anxiety. And the ALJ explained that that was not consistent with the record evidence, which showed intact or on one occasion mildly impaired memory and no confusion. And so under the regulations, the ALJ was required to consider the consistency of the opinion with other evidence and appropriately on this record found that it was not consistent with records that said the exact opposite of what Dr. Allao had attributed those limitations to. Dr. Allao also, in addition to memory loss, cited anxiety. His opinion was given in April 2018, and in February and June of 2018, Ms. Bennett affirmatively denied anxiety to her treating provider at that time. So, again, both of the bases that Dr. Allao cited as the basis for his opinion were not consistent with the record, and under the regulations as well as this court's precedent, interpreting those regulations, that was a proper reason to discount his opinion. Do you want to get back to the other opinions? Yes. As to the other opinions, Dr. Grassl's and Dr. Brown's opinions both fully support the RFC. Dr. Grassl opined that Ms. Bennett had mild limitations maintaining a schedule. Didn't every medical professional on the record reach the conclusion that there was some limitation on the ability to sustain a schedule? Dr. Grassl said a mild limitation, and Dr. Brown said no significant limitation. So, to the extent that they all mentioned that area, that is true, but the degree is very wide-ranging. Mild and no significant limitations. I'm looking at A75. Dr. Brown said Bennett would have, quote, moderate limitations in her ability to abide by a work schedule. Is that right? She said, look in- And then said it's not significantly limited in her ability to perform within a schedule, maintain regular attendance, or be punctual. Yes. But first, that there are moderate limitations in the ability to abide by a work schedule. She said, I'm looking at A75 of the district court record, 1A page 8. She said no significant limitation in maintaining attention and concentration for extended periods, performing within a schedule, maintaining regular attendance, and be punctual within customary tolerance. And then the last one on that page is moderately limited in completing a normal work day and work week without interruptions from psychological symptoms, which is consistent with the fact that she had severe mental impairments. She did have mental impairments that impacted her ability to work. That's why she had a severe impairment, and that's why there were limitations in the RFC. The ALJ did limit, as your honors have pointed out, to simple routine repetitive tasks, and that's perfectly consistent with the finding that she had no significant limitations in attending to a schedule, maintaining attendance, and maintaining attention and concentration for extended periods. So the same is true of Dr. Grassl's opinion as well. Mild limitations in maintaining a schedule did not require a reasonable fact finder to find that she could not sustain a schedule on a regular basis. I also want to highlight this court's decision in McIntyre, which is stated in our brief, where this court held that an RFC for simple routine tasks sufficiently accounts for even moderate mental limitations in sustaining concentration persistence or pace. So under that precedent, as well as the substantial evidence supporting the ALJ's RFC finding, we would say that substantial evidence supports the ALJ's decision here. And if your honors have no further questions, I ask that you affirm. With 57 seconds to spare. All right, thank you very much, Ms. Carter. Mr. Radl, you've got two minutes for rebuttal. Thank you, your honor. I'll just note again, there are aspects of the record where, as this court has recognized and as is expected, symptoms of mental illness wax and wane. But fundamentally, there's no question here, Ms. Bennett has a recognized severe psychological impairment, depression and anxiety. Those are recognized as severe by the Commissioner of Social Security. That's correct. I'm saying the fact that she occasionally reported some symptom of improvement or denied anxiety here and there, or there are some reports of activities in the record, is not sufficient by itself, should not be sufficient by itself, to overcome the opinion of her treating psychiatrists. Especially with which, in the context, as Judge Nathan pointed out, there are three other opinions from mental health providers, all of whom indicated a limitation with respect to her ability to manage stress and sustain a schedule. And I think, to counsel's point, there are accounting for simple and routine instructions is a RFC limitation that accounts for difficulties with concentration, persistence and pace. What's missing here is difficulties dealing with the stress of maintaining a consistent work schedule. So the RFC could have limited Ms. Bennett to low-stress work, work that did not involve production quotas, work that did not involve direct supervision or less frequent supervision. None of those limitations are contained, though, in the RFC determination. Counsel, but you've raised as the issue here the failure to properly apply the treating physician rule. Yes. And I understand that we're bringing in all the other medical opinions and records because of the question of whether it can be discounted in light of its inconsistency. But there are other factors to consider in terms of the assessment of the treating physician rule. So I want to bring us sort of away from the RFC generally, which is where you've been going, where your brief says the issue is the treating physician rule. So how many times did your client see Dr. Alejo? Right. It was a six-month period, right? Right. I have to check the record again. I think it was periodically over the course of six months. Of course it was periodically. But, like, every three months or every three days? Because I wasn't able to figure that out, and he doesn't indicate it. Because, of course, the frequency and duration of the treatment relationship is an incredibly important part. If he saw her twice, would that undermine the strength of his opinion? Yes. I think if that fact was a fact that the ALJ relied on, yes, it would. If the record had been developed in that respect, that would have been a reason for a factor to be considered when weighing his opinion. Yes. We don't know the frequency of the treatment in that case. Yes. We don't know the duration. Right. The duration is six months. That's correct. And I guess I would say if the court thought that was dispositive, then a remand for further development to determine what the actual frequency of the treatment relationship, that would be an appropriate result as well, and something that could be further developed as part of the remand. All right. Mr. Radl, can I ask you to do this? Yes. If I give you a week, can you then submit a letter to the court indicating whether you wish to make a supplemental filing? And if so, why it's appropriate? I know the government said that they have no objection to a filing, but I think that you have to at least establish why it's appropriate. If this information has been known for five months, is that relevant to our determination as to whether to grant it? But you may decide you don't even need it, that it doesn't change anything. And if that's the case, let us know that too. Is a week enough time to do that? Yes, Your Honor. Thank you. Okay. So what's today, the 12th? So the 19th? Yes, Your Honor. Thank you. All right. Thank you both very much. We'll reserve the decision. Thank you. And we'll move now to the last case on today's calendar. That's Brutus Treating v. The United States. Thank you. I guess it's really standard charter, United States third party. Yep. Few who gets that right the first shot. It's been butchered by brilliant people, I can tell you. That's why you got it right. Yes, exactly. Which gives me hope. Which gives me hope about your ultimate resolution of this case. But, you know, anyway, I'll look anywhere for it. Let me just state, you've got 10 minutes, but you've reserved three minutes for rebuttal. Yes, sir. Okay. May it please the court and actually good afternoon. We appeal the district court's order granting the government's motion to dismiss our case under the False Claims Act. And we've raised a number of different points in our briefs. I'm not going to go over them here. They, I believe, merit your consideration. But I'm going to address two points. But I would like to start by anticipating a question that I think you're going to ask me in light of your exchange earlier. And that is pending in the United States Supreme Court is U.S. X. Well, Polanski v. Executive Health Resources. It was argued about a month ago. And the question is whether this court should hold your decision pending Polanski. And I must reluctantly say yes. And the reason is this. The main argument that the Polanski petitioner advances there is that the government does not have the power to make a motion to dismiss once it has declined to intervene in a False Claims Act case. So it's quite a fundamental proposition. We have not made that argument here. But if the Supreme Court accepts that argument, depending on how they write that, and they say the government never had the authority to do what it has done here, that obviously affects these proceedings. So you can't get around that. Well, what you're saying is that you would make a different argument in light of. Well, it depends what the court says, you know. Well, that may be. But, I mean, you've made an argument which is saying we should follow the Ninth Circuit rule, right? In essence. Yes, well, but that's different, Your Honor. What the petitioner. If the U.S. doesn't have authority. To make a motion to dismiss. The Ninth Circuit doesn't even matter. They are saying that once the government has considered the case and declined to intervene, it no longer has the motion, the power to seek a dismissal of the relator's case. That's the argument that the Supreme Court can assert on. And so that's a pretty fundamental argument in the world of False Claims Act cases. And so it would have significant impact here. If the court agreed with the petitioner, we would certainly be saying something about that in this case, even though we have not made that argument here. You're saying it's not a waivable point, is that what you're saying? I believe that would be the case. But, again, it depends how the Supreme Court phrases what they say. Well, this one, I mean, unlike the other one, this one, we'll certainly know by June. Oh, yes, exactly. So, I mean, in the world of court decision-making, that's not necessarily a long time. This is the Second Circuit. Come on. Well, I try cases in the Rocket Docket, Your Honor, so that's a little bit different in Virginia. But this case has been going on for a really long time, too. Right, and there's that question, and then assuming that the United States can move to dismiss, then there's the standard question, the question of what standard to apply. That's exactly right, and that's right. That's unless you could say under any standard. Correct, and in Polanski, the government has run its unfettered discretion argument, and the Polanski petitioners have embraced Sequoyah, and they frame it, I think, in a pretty commonsensical way, which it's like an APA standard. It's arbitrary, irrational. It was the decision to dismiss arbitrary or irrational, and I think that's a good rule of thumb. That's what we would certainly embrace here. But the two issues that I'd like to address, first of all, is that we contend that under the False Claims Act and procedural due process, the district court erred in failing to hold an evidentiary hearing to adjudicate the government's motion on the particular record here, which involved sharply conflicting evidence and testimony from us, challenging the record that they put forward in the court. And indeed, the district court's opinion is striking in that it talks about all of the government's declarations and so forth, and mentions we filed some, but in coming to the conclusion that, oh, this is just a subjective disagreement, the court never examines or articulates what in our evidence suggests that that's the case. There are many False Claims Act cases where a petitioner will say, ah, you lazy bums, you just didn't do a good job. We are so far removed from that, and I think our briefs and the record detail very specifically in terms of the government's contentions that we didn't provide certain information, and so they couldn't make that judgment, and it's really quite striking. And I'll give you a couple examples just for purposes here, but we detail these in our briefs. First of all, the government contends that the district court concluded that the government had a valid purpose to terminate this case early because our factual allegations were meritless, so that's how you get into this whole thing. And what we put in the record was a challenge to that factual characterization. So, for example, the government's decision is based on a fraction of the evidence we produced. One of the people involved in this is named in the brief, Mr. Chandra, produced 20,000 records in September of 2013, showing illegal transactions, illegal counterparties, and most importantly within that, and this is discussed a bit in our briefs, is a document called the Juniper 35 list. And what that was, was that was an internal study done by a standard charter of these transactions. It was looking at what they did. So Juniper 35 is rich with illegal transactions, illegal counterparties, and so forth. So that 20,000 records came in in September 2013, but the government said it shut down its investigation in August of 2013. And it didn't let us know. And indeed, Mr. Chandra, who got these records at some personal physical risk, they had asked him to get this stuff, and he kept doing it. Now, I know that in the record, the government says, oh, we looked at these 20,000 records. Well, outside of the implausibility of that, just in terms of the time frames involved, as I say, with Juniper 35 in there, you cannot have reviewed those records and say, ho-hum, we didn't provide information like that. But there's things that are even simpler. But is this an argument, then, that the government's decision is fraudulent, arbitrary, or capricious? It's arbitrary and irrational, because their investigation was utterly arbitrary and irrational. It was closed off, and they contend that their investigation was thorough, but it was thorough because they didn't consider, basically, that we didn't produce all this evidence that we say we did. And in that context, and again, the merits of this dispute are not here. It is simply that in the face of that, and we don't believe that the hearing required on a government motion to dismiss in a false claim is required for every case. But in the particular situation here, and even the hearing that we're asking for is modest. But the court has this information. You're just saying that you felt that the district court's order didn't reflect that it had carefully considered the written submission. No, Your Honor, and thank you for asking that question, because I want to be really clear about this. Essentially, because of the detail of what we put in. And you're saying what you put in, so you gave it to the district court. Yeah, but the point is, Your Honor, is that the credibility of these witnesses are absolutely essential. You can't just on the paper record. I mean, you know, we quoted in our brief Judge Frank and other luminaries from this circuit that you just can't resolve lots of things on affidavits. And so what we contend is that we should have had the ability to cross-examine, and the government cross-examined our folks. And that could be done in a range of different ways. We're not asking for a full trial. We could have depositions. And then from that, once credibility was tested with cross-examination, then there would be a record that the court could do exactly what Your Honor is suggesting, but not here. But the second related part here is that the court, in a bit, stacked the record. I don't want to be too edgy about it. But we wanted to put in the testimony of Mr. Daniel Alter. Mr. Alter was former general counsel of the New York Department of Financial Services. If you recall, this case originated when news that the government investigators, both in New York and the feds, were resolving a sanctions matter with Standard Chartered. Our clients, who created Brutus Trading, knew that what was going on was far worse than what the government was agreeing to. They got nowhere initially with the federal investigators. But Mr. Alter basically had one of those oh-you-know-what moments and started launching a much more vigorous investigation and so forth. So what we asked the court, we said, look, and we provided a very detailed offer of proof. It said joint appendix, I'm sorry, 442, articulating what Mr. Alter could say. And he, as the lead investigator for New York, would articulate the value of what our clients put in that directly contradicts what these other investigators say. So we asked the court, look, the government is putting in all these affidavits. And this goes back to this credibility point, Your Honor, too. We should be allowed to at least depose Mr. Alter, and we needed a subpoena to do that, and the court denied that. So it's both the fact that the competing views of the evidence require cross-examination, require that testing and credibility testing of these witnesses. Your assertion is that the government was lying when it said the things it said in its submissions? Even the Ninth Circuit test, right? Then, at least for that test, the government has to at least articulate some reasons and a relationship between the reasoning and the dismissal. And then the burden shifts to you later to basically say, well, those reasons are arbitrary, capricious, illegal, or fraudulent. You're not saying fraudulent, right? Well, I don't know what was in the mind of these folks, but they were certainly wrong. But, Your Honor, your analysis, we are up at the first level. Remember, the district court's ruling said that there was a valid government purpose here. And what that purpose was, according to the district court, was early termination of a case, quote, as to which the government has determined that the factual allegations were meritless. That, by the way, is at Joint Appendix 777 and 778. So the factual allegations being meritless is the key conclusion of the government. There has to be a hearing on that before you can get to the second prong of this accord. Right, but our point is that the evidence challenges the government's determination that our factual allegations were meritless, because that's what drove the justification for termination. And that's the reasoning that the district court followed. But I would say, wherever you do it, the point is that the end result, the dismissal of the case, was arbitrary and irrational, given the evidence that we put in. And it really required resolution by this very modest evidentiary hearing. We're way over, but I do want to ask one other question. If we think you're advised to wait for the Supreme Court in Polanski, and they come back and adopt some variation of the D.C. Circuit Test, which is basically the government's unfettered discretion to do this, that would, I guess, resolve part of your appeal. But you still would argue of the procedural error of a lack of a hearing? It kind of depends on how it's written, I understand that. Yes, I would. And, Your Honor, I know I've gone over, but maybe in my rebuttal I will address the whole unfettered point, because I don't think that's what's going to happen for a range of different reasons. But the answer to your question is, I think, yes, if I understand your question. Thank you. We'll now hear from your adversary. That's the sheet. I lost my sheet. Mr. Barnea. Mr. Barnea. Sorry. Mr. Barnea, did we go to law school together? We did, indeed. Nice to see you. Nice to see you, too. It has been a long time. May it please the Court, good afternoon, Your Honors. In this case, the government found no evidence supporting the relator's allegations, concluded they were based on an invalid legal theory, and determined that permitting further litigation would waste government resources. The government thus moved to dismiss the relator's complaint under 3730C2A. The district court The invalid legal theory is not what the fiduciary court really got to. The district court found that the dubiousness of the legal theory and the novelty itself justified the government's decision, and so it didn't even need to get to the actual invalidity of the legal theory. Its very dubiousness was itself a proper justification, which would be a perfectly acceptable basis for this court to affirm its decision. Perhaps I could start just by talking about Polanski, since that seems to be the elephant in the room. The government, you know, likely outcome of Polanski that would change the outcome here in terms of that would cause a disruption. Likely outcome, but there's one of the questions they're taking is whether the government can move at this stage. If the answer to that is no, and I don't disagree that's unlikely, but who knows. If the answer to that is no, then what? Well, actually, I think even in that case, the government can prevail here because what happened in Polanski is the government declined. The case went through litigation for months, if not years, and then I believe it was the eve of trial or very late in litigation. The government then sought to intervene and to move to dismiss. That was tightly contested between the parties as to whether that was appropriate, why the government had waited so long. There's a very long record about that. And, you know, in that circumstance, there could be some courts could come to different views as to whether the government waited too long to intervene, to exercise its right. In this case, the government declined to intervene and immediately moved to dismiss. That was according to how we've always done it in the third circuit in Polanski and the seventh circuit in that case that I cannot pronounce, but starts with CIMZ and has many other letters after it. What the courts of appeals did in those cases was they said, well, we understand that in these cases, the government did not separately move to intervene before it moved to dismiss, but we will construe the motion to dismiss as including a motion intervened for the limited purposes of moving to dismiss. And in fact, in our brief, we said the same thing to this court that, you know, this would just be a procedural nicety. If the law had been clear, for example, however many years ago, that one, what the government must do in order to move to dismiss is to intervene. Then we would have simply filed a notice that has two different words instead of we moved to decline to intervene and then move to dismiss. We would have simply said, move to intervene for the limited purposes of moving to dismiss and everything would have proceeded from that point. So it does not strike me as an outcome that I can conceive. Just technically, if that's the resolution, then what we, now we construe the motion to dismiss as including a motion to intervene. That is what the third circuit and the seventh circuit did in both of those cases. In neither of those cases, the government moved to intervene. And so, and again, absent a lengthy delay between those things to default the government on, you know, a procedural hiccup based on an after the fact ruling would seem sort of disproportionate to any possible outcome. It's a little context all the time. The Supreme Court, I mean, and usually their statutes and legislations have run based on the rules. Anyway, but so you're saying we should, should or shouldn't wait for Polanski. I don't at this point, given that it's already been argued and will be decided this spring, I don't see any reason why you, why you wouldn't wait. It will in all likelihood settle this. It will certainly settle this question of intervention and it will all result in reviewing the motion to dismiss rather than this court having to engage in the, if we have to use the ninth circuit, you know, reaffirm for this reason, but if it's the DC circuit or the third circuit standard. So I think it would simplify matters. There's no reason in my, in my mind not to wait. I just don't view it as outcome determinative. I think it's just more for ease of drafting the opinion. So I'd like to talk about a few things that my adversary pointed out in his First, I think, I think it's important to talk about the notion of a hearing. First of all, which, which I want to be clear as whether the district court held a hearing here, here is as a matter of this court would review for abuse of discretion only that that was made clear in the abbey summary order and other places. The notion of whether a hearing is appropriate. First of all, several courts have pointed out that hearings in these cases are You know, justified by an extraordinary submission by the relator, but the hearing must be tied to the standard of review. So if the standard of review is even in the ninth circuit, that the government acted in a constitutional, constitutionally arbitrary way or unconstitutionally or fraudulently, then the only thing that should trigger a hearing is evidence of something like that, a significant showing of something like that, that the court would then have to result in hearing. There is no basis for a hearing on simply the question of, did the government do a good job in its investigation in the relator's view or does the. Is it not one degree? It's not that they didn't do a good job. They didn't do a good job to the point where it is an arbitrary and capricious decision. Well, again, I don't think that there are several courts and we cite them in our, in our opinion that, that cite the adequacy of the government's investigation in the relator's view as simply not being relevant to any of these standards. This is not about, so no investigation would not be susceptible to an allegation of arbitrary and capricious. This again, this is not arbitrary and capricious. This, this is not APA review. This is review even under the ninth circuit standard for whether the ninth circuit standard is not APA review to, to disagree with my, my adversary. The ninth circuit standard, if you read this clear case carefully talks about essentially the government acting fraudulently or arbitrary in a way that that violates substantive due process. So that the government acted in such an egregious way as to, you know, violate the very role that it is supposed to take in, in, in a false claims act investigation or in moving to dismiss for an improper purpose. This is not, you know, did the agency you know, consider all of the factors before issuing its regulation type APA review whatsoever. And we cite several cases and including the Sequoia decision itself in the ninth circuit that makes clear that, and it refers to the substantive due process standard from the Supreme Court in, in looking for exactly that this is not, but let's all re-review the government's investigation and decide, you know, In a court of appeals, whether the government investigation was thorough enough or Well, it sort of depends on, on the issues. So the, the government in some cases may not investigate a false claims act case at all factually. So if, for example, a false claims complaint filed by a relator came in, that was plainly on its face, legally deficient, the government may say, we're not devoting any AUSA's time to investigate the factual allegations here, because even if they were true, the legal basis, isn't there to allege a false claims act. Our office does that sometimes. There may be other reasons why Let me just interrupt. So then would the district court be free to consider the merits of that legal conclusion? The, the district court can consider the good faith basis put forth by the government for why it's under the Sequoia standard, the good faith basis put forth by the government as to why it moved to dismiss a particular case. In some cases, as in this case, it may be, we've investigated the relators claim and found them to be without merit as well as others. In other cases, there may be other reasons why the government moved to dismiss. And so, yes, if, if, if there was an allegation that the government lied, that they, the agent committed perjury when he said we investigated these allegations when in fact he had not, you know, where he said we invest in interviewed the relator when in fact he did not interview the relator, perhaps that could amount to some kind of fraud on the court. That would, I'm not sure what, but you're saying that if the government just says, we defined, we looked into it. We think it's, uh, then unless this is under the ninth service, unless the relator can come up with something to say, that's a lie that whatever statement was just put in the declaration of the perjury is false. Uh, then you don't get a hearing. Yes. Because even in the most kind of, uh, I don't know what to call it. Liberal ninth circuit standard. It's really an inquiry into the government's good faith in moving to dismiss this. These are the government's claims. These are the, these are claims of fraud against the government. The government has broad discretion in deciding whether to pursue them, to not pursue them, to dismiss them or do whatever it wants with them. And the only question in judicial review, even in the ninth circuit review is, is the government exercising that authority, that very broad authority that it has to control its claims of fraud against it in bad faith. So unless there is some compelling reason to believe that the government acted in bad faith and some substantial showing by the relator that there was bad faith that would require some kind of evidentiary hearing to get to the bottom of the, the role of the district court in reviewing these motions is extremely circumscribed. And rightly so because of the, the nature of the claim and the, the very sweeping power that is granted to the government in, in this, in this provision furthermore, just, I see my time is up, but just to finish the thought again, the government did not only rely on, on the comprehensiveness of its investigation and to, to justify the dismissal. It also pointed to the legal inadequacy, which the district court didn't even feel the need to reach, but it is still there. In addition to its dubiousness, it is actually legal wrong. And furthermore, the government pointed out to the substantial use of government resources that would be entailed in this litigation, which itself many courts have routinely upheld as a justification for, for a government motion to dismiss. So we have three valid reasons here. And the fact that the relator feels that the investigation did not come out to his liking or that the relator does not understand or believes that the government came to the wrong conclusion in assessing the evidence that, that the relator presented to the government doesn't even come close to meeting the standard on one of those, let alone on the other two. So for all of those reasons, unless the court have any questions, we believe this court should affirm the discourse. Much of my colleague from the U.S. attorney's office's argument focuses on trying to portray this case as something that it's not. This has nothing to do with us having an investigation that was not to our liking, but it also, it doesn't involve substantive due process. So the procedural issue here is a procedural due process one. And so this point about this high, high level to deal with substantive due process, this has been, this is in the briefs, but I want to clarify that. But the two fundamental points I think I'd like to make, and going back to your question to me earlier, yes, the government agents lied. They lied in several different ways and we articulate those in our briefs. You accused them of lying in the district court? Yes. You accused them of lying. Let me tell you what they did and then you, you know. Tell me where you accused them of lying. I mean, it's contradicting that they're not the same as lying. Well, and then let me tell you what the facts are. And then if you would prefer to call it contradiction, but I still think it goes to the point of whether their judgment that our case was meritless was arbitrary or rational. One example of that concerns the spreadsheets that we produced from Standard Chartered with a lot of transactions. Now, the evil people at Standard Chartered hid much of the information behind hidden cells in those spreadsheets. And I'm not a techie by any stretch of the imagination, but you have to know how to open it to get to it. The government says that they never saw any hidden cells and we never told them anything about it. Yet in the record is a detailed memorandum from Relators Council, Mr. Koenigsberg, taking step by step through how you open those hidden cells. And that particular letter was from January 9th, 2019. Well, this actually was a whole range of other things that he articulated. It said Joint Appendix 753 of information that we provided to the government that the government agents had denied that we did. And there's a list in there. I mean, it's a lot of detailed information, which is why it is so different from the just we don't like this investigation case. I've never seen a case like this before in the false claims world with the detailed evidence that we've put in. All we want is a evidentiary hearing to test the credibility of these people. The second thing, though, that I have to say is that the government's argument is woven through with this notion of very broad authority in this context. That is legally incorrect. They don't have very broad authority in the context of this case. The relator has a property interest in the cause of action and is equally a party in interest here. And the government, the False Claims Act was enacted in 1863. From 1863 to 1943, once the relator launched a case, no one could mess with that case. The government had no right to intervene or whatever. And in 1943, Congress changed the law slightly to allow the government to take over a case and then in 1986 to allow the government to intervene after it had declined and so forth. But so the whole concept and the constitutional underpinnings of why the False Claims Act works and separation of powers and all that, it doesn't start with the notion that the government has some unique authority here. But related to that, though, is the congressional purpose of having relators wasn't just to deputize citizens, to broaden the arm of law enforcement, to protect the government from fraud. That was clearly one of the main ones. But another congressional purpose, and we've quoted this in our brief, and it's from the Senate report that we've quoted, that this court has quoted in other cases, which is 99-345, page 26. And there it says that the relator is to, quote, act as a check that the government does not neglect evidence, cause undue delay, or drop the false claims case without a legitimate reason, close quote. So I would respectfully submit, and the court has been so kind with the time, that the notion, it's the opposite of very broad authority here. It's not that the government doesn't have legitimate interests, but so does the relator, and the relator has been deputized by Congress to do certain things, including hold the government accountable when it wants to ditch a False Claims Act case. But it sounds, again, like the landscape may provide a lot of clarity as to how broad or narrow. Not that I would. I hope so, Your Honor. Okay. We will reserve the decision. Thank you all very much. That concludes the arguments for today's calendar. Let me thank our Corporal Deputy, Ms. Beard, who is asked to now adjourn the court. Court is adjourned. Thank you.